UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

YOLANDA TORRES AS THE ADMINSTRATRIX OF
THE ESTATE OF LUIS FIGUEROA and TANYA
MUSMACHER,

                        *Plaintiffs*,

        -against-

CITY OF NEW YORK; PATRICK MCILMURRAY;
DOMINIC RUGGIERO; and JUAN CRUZ,

                        *Defendants*.

21-CV-2154 (ARR) (MMH)

NOT FOR ELECTRONIC
OR PRINT PUBLICATION

**OPINION & ORDER**

ROSS, United States District Judge:

Plaintiffs Luis Figueroa[1] and Tanya Musmacher bring this action against individual defendants Patrick McIlmurray, Dominic Ruggiero, and Juan Cruz (together, "the defendant officers"), as well as their employer, the City of New York (collectively, "defendants"). Plaintiffs raise a variety of claims under 42 U.S.C. § 1983 and New York law arising from the plaintiffs' arrest by defendant Ruggiero on April 21, 2018. Defendants move for summary judgment on all counts of plaintiffs' complaint. For the reasons set forth below, I grant defendants' motion in its entirety.

## BACKGROUND[2]

At approximately 12:22 a.m. on the morning of April 21, 2018, a man named Vhayo Sherpa placed a call to 911 to report an attempted robbery near the intersection of 41st Avenue and 72nd

---

[1] Mr. Figueroa died in 2021 and was replaced as a plaintiff in this action by his mother, Yolanda Torres, who is the administratrix of his estate. *See* Yolanda Torres Aff. Supp. Mot. Amend Compl., ECF No. 31. For ease of reference, in this opinion I refer to the plaintiffs as "Mr. Figueroa" and "Ms. Musmacher."

[2] The following facts are derived from the parties' depositions, exhibits, memoranda, and

Street in Queens, New York. Defs.' 56.1 Statement ¶ 1. Mr. Sherpa reported to the 911 operator

that, as he exited his car and went to retrieve his nine-year-old daughter from the backseat, a man

armed with a knife approached Mr. Sherpa and said, "give me your keys." *Id.* ¶ 2; *see also* Decl.

of Inna Shapovalova Supp. Mot. for Summ. J. ("Shapovalova Decl."), Ex. A, ECF No. 72-1 (audio

recording of 911 call).[3] Mr. Sherpa gave the 911 operator a brief description of the man, who, he

said, was accompanied by a woman. Defs.' 56.1 Statement ¶ 2. Mr. Sherpa reported that the man

was wearing blue jeans, the woman was wearing a black jacket, and both the man and the woman

fled the scene on foot. *Id.*

Subsequently, at or shortly before 12:43 a.m., officers of the New York Police Department

("NYPD") arrived at the scene and interviewed Mr. Sherpa. *Id.* ¶ 3; *see also* Decl. of Anthony

Ofodile Opp'n Mot. Summ. J. ("Ofodile Decl."), Exs. 5–6, ECF Nos. 75-5, 75-6 (body camera

footage of the interview). During that interview, Mr. Sherpa provided a more detailed description

of the people who attempted to rob him. Specifically, Mr. Sherpa told the officers that the man

was wearing "a blue jean jacket," a "hoodie" with the hood over his head, and "a mask, like a

handkerchief[,]" that was red and white. Ofodile Decl., Ex. 5 at 03:55–04:21. When asked about

the man's pants, Mr. Sherpa said he did not remember them. *Id.* He further stated that the woman

was wearing a "black jacket" and a mask, and gestured to describe some additional clothing feature

---

respective Statements of Fact submitted under Local Rule 56.1. *See* Defs.' Rule 56.1 Statement ("Defs.' 56.1 Statement"), ECF No. 73; Defs.' Mem. Supp. Summ. J. ("Defs.' Mot."), ECF No. 74; Pls.' Resp. to Defs.' 56.1 Statement, ECF No. 76; Pls.' Rule 56.1 Counterstatement ("Pls.' 56.1 Statement"), ECF No. 77; Pls.' Mem. Opp'n Summ. J. ("Pls.' Opp'n"), ECF No. 78; Defs.' Reply Supp. Summ. J. ("Defs.' Reply"), ECF No. 79; Defs.' Resp. to Pls.' 56.1 Counterstatement, ECF No. 80. Unless otherwise noted, the facts as recounted here are undisputed. All evidence is construed in the light most favorable to plaintiff as the non-moving party. *See Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002).

[3] I note that it is apparent from the audio recording that Mr. Sherpa's first language is not English. The 911 operator, apparently having difficulty understanding Mr. Sherpa, repeatedly asked him for clarification and may not have understood his report in full.

on the woman's back. *Id.* at 04:21–04:40. When asked about the race of his assailants, Mr. Sherpa stated that they looked "Arabic or something like that." *Id.* at 04:42–04:51. He described both suspects as being about the same height as him and skinny. *Id.* at 04:51–05:00. He also indicated, by pointing to one of the officers with a similar complexion to the suspects, that both the man and woman were light in complexion. Ofodile Decl., Ex. 6 at 04:25–04:35. Following the interview, one of the officers relayed the following information regarding the suspects over police radio: "It was light complexion, female-male, both about five-foot-five. The male was wearing a denim jacket. The female was wearing a black sweatshirt. Both with a mask over their face, red and white in color." Ofodile Decl., Ex. 5 at 06:25–06:40. The officer also instructed several colleagues to canvas the surrounding area. *Id.*

A few minutes later, NYPD officers stopped plaintiffs Figueroa and Musmacher, together with another man, at the intersection of Broadway and Roosevelt Avenue in Queens, a few blocks from where Mr. Sherpa reported the attempted robbery. Defs.' 56.1 Statement ¶ 3. According to defendants, Mr. Figueroa, Ms. Musmacher, and the other man were running when the officers spotted them. *Id.* ¶ 4. According to plaintiffs, however, only the other man was running at the time. Pls.' Resp. to Defs.' 56.1 Statement ¶ 4. The record contains photographs of Mr. Figueroa and Ms. Musmacher wearing the clothes they had on when they were stopped. *See* Shapovalova Decl., Exs. H–I, ECF Nos. 72-8, 72-9. In those photographs, Mr. Figueroa appears to be wearing jeans made from blue denim covered with distinctive white patches, similar in appearance to splotches of paint. Shapovalova Decl., Ex. H. Mr. Figueroa was also wearing a blue garment underneath a gray hooded jacket or vest, and black sleeves. *Id.* The photograph of Ms. Musmacher shows her wearing blue overalls that reach the height of her chest, over which she is wearing a light-colored hooded sweatshirt and a black overcoat with buttons. Shapovalova Decl., Ex. I.

3

At approximately 12:58 a.m., NYPD officers Jaysen Tejada and Yue Liu brought Mr. Sherpa in a police car to the location where Mr. Figueroa and Ms. Musmacher had been stopped to conduct a "show-up identification procedure." Defs.' 56.1 Statement ¶ 7; Shapovalova Decl., Exs. J–K, ECF Nos. 72-10, 72-11 (body camera footage of the show-up and subsequent arrest). Officer Liu stopped the car near the sidewalk where Mr. Figueroa and Ms. Musmacher were standing, surrounded by police officers. Defs.' 56.1 Statement ¶ 8; Pls.' 56.1 Statement ¶ 52. While Mr. Sherpa was still in the car, Officer Tejada instructed him to "take a good look" through the window. Shapovalova Decl., Ex. K at 01:10–01:12. Mr. Sherpa identified Mr. Figueroa and Ms. Musmacher as the individuals who had attempted to rob him. Ex. K at 1:49–2:06. Officer Tejada then exited the car and asked Mr. Figueroa and Ms. Musmacher to step closer to the window. 02:08–02:27. Mr. Sherpa confirmed his identification, stating "yeah that's them." *Id.*; Defs.' 56.1 Statement ¶¶ 10–12. At that point, defendant officer Dominic Ruggiero placed Mr. Figueroa and Ms. Musmacher under arrest. *Id.* ¶ 13; Pls.' 56.1 Statement ¶ 35. As Officer Ruggiero[4] did so, Mr. Figueroa and Ms. Musmacher became agitated, loudly insisting that they had committed no crime. Shapovalova Decl., Ex. K at 02:40–04:45. Among other protests, Mr. Figueroa exclaimed, "We wasn't even robbing or anything." *Id.* at 03:53–03:58. Defendants claim that this statement was "unprompted" because the officers had not yet informed plaintiffs of the charges against them. Defs.' 56.1 Statement ¶ 14. Plaintiffs, however, deny that the statement was unprompted. Pls.' Resp. to Defs.' 56.1 Statement ¶ 14.

Following the arrest, officers brought Mr. Figueroa and Ms. Musmacher to the NYPD's 108th Precinct for processing. Defs.' 56.1 Statement ¶ 16; *see also* Shapovalova Decl., Ex. M,

---

[4] For the sake of clarity, I refer to the defendant officers throughout this opinion using the titles they held at the time of the incident on April 21, 2018.

ECF No. 72-13 (body camera footage depicting processing at the police station). According to defendants, during processing, officers recovered a pipe containing cocaine residue from Mr. Figueroa's jacket pocket. *Id.* This assertion is supported by a laboratory report. Shapovalova Decl., Ex. O, ECF No. 72-15. It is uncontested that the officers also recovered two hypodermic needles from Ms. Musmacher's person during processing. Defs.' 56.1 Statement ¶ 17. In her deposition, Ms. Musmacher testified that she was a registered participant in the New York City needle exchange program, making her legally permitted to carry the needles. Ofodile Decl., Ex. 4 at 95, ECF No. 75-4 (deposition transcript of Tanya Musmacher); *see also* Ofodile Decl., Ex. 8, ¶ 4, ECF No. 75-8 (unsworn statement attesting to the same).

Later that same day, Mr. Figueroa and Ms. Musmacher were arraigned in Queens County Criminal Court. Mr. Figueroa was charged with attempted robbery, criminal possession of a controlled substance, and endangering the welfare of a child. Defs.' 56.1 Statement ¶ 18; *see also* Shapovalova Decl., Ex. P, ECF No. 72-16 (criminal complaint against Mr. Figueroa). Ms. Musmacher was charged with attempted robbery and endangering the welfare of a child. Defs.' 56.1 Statement ¶ 19; *see also* Shapovalova Decl., Ex. Q, ECF No. 72-17 (criminal complaint against Ms. Musmacher). Twelve days later, on May 3, 2018, an assistant district attorney ("ADA") in Queens County independently interviewed the complaining witness, Mr. Sherpa. *Id.* ¶ 21. Mr. Sherpa told the ADA that he was confident in his identification of Mr. Figueroa and Ms. Musmacher. *Id.*; *see also* Shapovalova Decl., Ex. R, ECF No. 72-18 (notes taken by the ADA that describe the interview of Mr. Sherpa).

Ultimately, a grand jury indicted Mr. Figueroa on just one charge: criminal possession of a controlled substance (cocaine). Defs.' 56.1 Statement ¶ 22. Ms. Musmacher was not indicted for any offense related to the April 21 incident. According to a "transfer memo" apparently prepared

by an employee of the district attorney's office, which plaintiffs provide as an exhibit, the grand jury "kicked the female defendant's [i.e., Ms. Musmacher's] entire case." Ofodile Decl., Ex. 9, ECF No. 75-9.[5] Ms. Musmacher spent 12 days in jail before she was released on bail. *See* Shapovalova Decl., Ex. T at 2, ECF No. 72-20 (plaintiffs' notice of claim). Mr. Figueroa was incarcerated for approximately three months before being released on his own recognizance. *Id.*

Some time after Mr. Figueroa and Ms. Musmacher were arrested, the 108th Precinct distributed internal "have arrest" messages or "posters" throughout the NYPD to "let the other precincts know that these two people were arrested for robbery." Ofodile Decl., Ex. 2 at 36–40, ECF No. 75-2 (deposition testimony of Patrick McIlmurray). While the messages are not themselves included in the record, they are described in sworn deposition testimony as having directed recipients to "notify Detective Patrick McIlmurray" if they had any information regarding Mr. Figueroa or Ms. Musmacher. *Id.* at 37, 38. Patrick McIlmurray, who is one of the defendant officers, held the rank of detective at the time of the arrests and retired prior to the initiation of this lawsuit. *Id.* at 9–10, 31. Detective McIlmurray testified at his deposition that, after this lawsuit was filed in 2021, he was informed by NYPD's counsel that he "was getting sued" in connection with the cases of Mr. Figueroa and Ms. Musmacher, to which he had been assigned to "as enhancement" for the purpose of conducting further investigation after the arrests. *Id.* at 28–31. However, Detective McIlmurray also testified that he was off duty on the day of the arrests and did not recall working on either case or interviewing either plaintiff. *Id.* at 26–27, 31, 38–40. Detective McIlmurray further testified that, after this lawsuit was commenced, he was never provided copies

---

[5] The transfer memo further states that "there is nothing to do other than dispose of this case" and indicates that the case was "to be pled out." *Id.*

of internal NYPD records called "DD5s" that would help him recall what, if any, work he did in the cases. *Id.* at 30. No documents meeting the description of these DD5s are present before me.

On April 19, 2021, Mr. Figueroa and Ms. Musmacher commenced this action, asserting violations of their civil rights under 42 U.S.C. § 1983 and New York law. *See* Compl., ECF No. 1. The operative complaint was filed on July 12, 2022. *See* Second Amended Compl. ("SAC"), ECF No. 34. Following discovery, defendants filed the instant motion for summary judgment, which is now fully briefed.

## LEGAL STANDARD

"Summary judgment is appropriate only where the record shows 'that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 80 (2d Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). A material fact is one that "can affect the outcome under the applicable substantive law." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996). A genuine dispute is one that can "reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "Summary judgment is appropriate when 'there can be but one reasonable conclusion as to the verdict.'" *Rupp v. Buffalo*, 91 F.4th 623, 634 (2d Cir. 2024) (quoting *Anderson*, 477 U.S. at 250).

The party seeking summary judgment carries the burden of proving that there is no genuine dispute of material fact, and I must draw all reasonable inferences in favor of the nonmoving party. *See Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1223–24 (2d Cir. 1994). Nevertheless, "[t]he nonmoving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998).

**DISCUSSION**

I.    **False Arrest & Unlawful Stop and Search Claims**

Plaintiffs raise a variety of constitutional claims challenging the defendant officers' decision to stop them—and, subsequently, to arrest them. Because the undisputed facts establish that the officers had both reasonable suspicion to make the stop and probable cause to make the arrest, I grant defendants' motion for summary judgment on those claims.

1.    *Unlawful Stop & Seizure*

Plaintiffs first argue that the officers' decision to stop them was unlawful because it was not supported by reasonable suspicion. *See United States v. Sokolow*, 490 U.S. 1, 7 (1989) ("[T]he police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). Reasonable suspicion requires that "the detaining officers . . . have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez,* 449 U.S. 411, 417–18 (1981); *see also United States v. Santillan*, 902 F.2d 49, 56 (2d Cir. 2018).

Here, there is no genuine issue of material fact as to whether the officers had reasonable suspicion to stop and detain plaintiffs for the brief period preceding the show-up identification. It is undisputed that plaintiffs were observed near the scene of the attempted carjacking less than thirty minutes after it occurred. Pls.' Oppn' 8; Defs.' Resp. to Pls.' 56.1 Statement ¶ 33. The time between the initial stop and the show-up was no more than twenty minutes and did not involve physical contact, let alone force. Pls. 56.1 Statement ¶ 52. And while the parties dispute one another's characterization of the color and style of various articles of clothing worn by plaintiffs, *see, e.g.*, Pls.' Resp. to Defs.' 56.1 Statement ¶ 5, I can see myself that the photographs depict

plaintiffs dressed in a way that generally matched Mr. Sherpa's initial description of a man in jeans and a woman in a black jacket. *See* Shapovalova Decl., Exs. H–I, (photos taken at post-arrest processing). Nor are the discrepancies between plaintiffs' appearance and Mr. Sherpa's speculative assertions that his assailants were "Arabic" and about the same height as him (five feet, five inches), Ofodile Decl., Ex. 5 04:42–05:00, so great as to undermine reasonable suspicion. The description transmitted though police radio stated only that the assailants were of "light complexion," *id*. at 06:25–06:30, which accurately describes plaintiffs as they appear in precinct photographs. As to the height discrepancy, the fact that an eyewitness is "off by a few inches or several pounds" does not negate probable cause, let alone reasonable suspicion. *Keith v. City of New York*, No. 11-CV-3577, 2014 WL 6750211, at *15 (S.D.N.Y. Dec. 1, 2014), aff'd, 641 Fed. Appx. 63 (2d Cir. 2016).

Based on that evidence, I conclude that there is no genuine issue of material fact as to whether the officers "had reasonable suspicion to initially stop and detain [plaintiffs] for the relatively short period of time it took to conduct the show-up identification[.]" *Gil v. Cnty. of Suffolk*, 590 F. Supp. 2d 360, 367–68 (E.D.N.Y. 2008); *see also Madrid v. Ercole*, No. 08-CV-4397, 2015 WL 7779207, at *3 (E.D.N.Y. Dec. 2, 2015) ("[A]n officer has reasonable suspicion to detain an individual where a dispatcher broadcasts a perpetrator's general description and an officer observes, even mistakenly, an individual matching that description in close proximity to the alleged crime.").

### 2. *False Arrest*

To prevail on a false arrest claim under § 1983, a plaintiff must prove that "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise

privileged." *Guan v. City of New York*, 37 F.4th 797, 804 (2d Cir. 2022) (citation and internal quotation marks omitted). Moreover, "[t]he existence of probable cause to arrest . . . is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983." *Sacaza v. City of New York*, No. 22-CV-02954, 2024 WL 4333688, at *5 (E.D.N.Y. Sept. 26, 2024) (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)). "When information is received from a putative victim or an eyewitness, probable cause exists, unless the circumstances raise doubt as to the person's veracity." *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (citations omitted).  "[T]he veracity of complaints by citizens who are the victims of the very crimes they report to the police is assumed." *Walker v. City of New York,* No. 15-CV-500, 2017 WL 2799159, at *4 (E.D.N.Y. June 27, 2017).

Here, plaintiffs argue that the circumstances raise a doubt as to the reliability of Mr. Sherpa's identification. Plaintiffs' primary argument is that inconsistences between Mr. Sherpa's descriptions of his assailants and the plaintiff's actual appearance undermines probable cause. Pls. Opp'n 11. In reality, the discrepancies between Mr. Sherpa's 911 call, Mr. Sherpa's subsequent description to police, and plaintiffs' ultimate appearance were relatively minor, especially considering the communication barriers evident on the recordings. *See Walker*, 2017 WL 2799159, at *4 ("While discrepancies between a witness's description and a suspect's appearance are factors to be considered in evaluating the totality of the circumstances, they do not, of themselves, negate probable cause." (citation and internal quotations omitted)). More importantly, Mr. Sherpa unequivocally identified plaintiffs as his assailants during the show-up, which occurred less than an hour after the initial encounter. This eyewitness identification provided the officers with probable cause notwithstanding the prior discrepancies. *See Sorrell v. Cnty. of Nassau*, 162 F. Supp. 3d 156, 166 (E.D.N.Y. 2016) ("The show-up provided the officers with probable cause to

arrest plaintiffs despite any variations between their radioed descriptions and their actual appearance."); *Morgan v. Cnty. of Nassau*, No. 13-CV-06524, 2017 WL 664027, at \*10 (E.D.N.Y. Feb. 17, 2017) (collecting relevant cases). The contrary conclusion "that once a victim gives a description of a perpetrator, a police officer is not permitted to arrest a suspect if his appearance does not precisely match that description, *even if* the complaining victim who gave the description identifies the perpetrator . . . has no sound basis." *Walker*, 2017 WL 2799159, at \*4.

Plaintiffs separately argue that Mr. Sherpa's identification was invalid because the show-up procedure was "unduly suggestive." Pls. Opp'n 11. Plaintiffs identify two features of the procedure that might be considered suggestive: (1) plaintiffs were "surrounded by numerous uniformed [police officers]" and (2) plaintiffs were made to approach the police car while "their hands were held [but not handcuffed] behind their backs." Pls.' Opp'n at 11. These factors, which are "inherent feature[s] of most show-ups," do not alone render an identification "unduly suggestive." *Morgan*, 2017 WL 664027, at \*10. More generally, plaintiff opines that show-up identification is generally problematic and should "be avoided except when unavoidable." Pls. Opp'n 12. This characterization is plainly contradicted by Second Circuit law, which recognizes that "show up identifications are a necessary and important part of policing and are not . . . disapproved of in this circuit." *Walker*, 2017 WL 2799159, at \*5. *See Brisco v. Ercole*, 565 F.3d 80, 91 (2d Cir. 2009) ("Here the [show-up] procedure enabled the officers to determine whether they 'had their man' while the witness's memory was still fresh."); *United States v. Bautista*, 23 F.3d 726, 730 n.6 (2d Cir. 1994) ("[R]ather than excoriate the law enforcement officials involved for conducting an unduly suggestive procedure, one might commend them for their immediate efforts to ascertain and release innocent people.). Accordingly, there is no basis for a factfinder to

conclude that "the show-up in this case was so suggestive such that it could not provide probable cause to arrest[.]" *Sorrell*, 162 F. Supp. 3d at 166.

### 3. *Qualified Immunity*

Plaintiffs' unlawful stop and false arrest claims are also barred by qualified immunity. Qualified immunity protects government officials, like the defendant officers here, from civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation and internal quotation marks omitted). Qualified immunity is available where "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015).

For the purpose of the unlawful stop and false arrest claims, the relevant question is whether, at the time the officers encountered plaintiffs, the existence of reasonable suspicion or probable cause was "arguable." *Stewart v. Davis*, 738 F. Supp. 3d 361, 368 (S.D.N.Y. 2024). "Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Myers v. Patterson*, 819 F.3d 625, 633 (2d Cir. 2016). "Put another way, an arresting officer will find protection under the defense of qualified immunity unless no reasonably competent officer could have concluded, based on the facts known at the time of arrest, that probable cause [or reasonable suspicion] existed." *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016).

In light of the facts discussed above, there is no genuine issue of material fact as to whether the officers had arguable reasonable suspicion for the initial stop and arguable probable cause for

the arrest. "Even if the arresting officers were somehow mistaken . . . it was certainly reasonable for them to believe that reasonable suspicion existed to stop and detain and that probable cause existed to arrest." *Gil*, 590 F. Supp. 2d at 370. "It is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and . . . in such cases, those officials—like other officials who act in ways they reasonably believe to be lawful— should not be held personally liable." *Lennon v. Miller,* 66 F.3d 416, 423 (2d Cir.1995).

## II.    Malicious Prosecution Claim

Plaintiffs also raise a claim of malicious prosecution based on the filing of charges that were ultimately dismissed. *See* SAC ¶¶ 49–51. In considering this claim, I look to New York law. *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010). "To establish a malicious prosecution claim under New York law, a plaintiff must prove (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Id.* (citations and internal quotation marks omitted). Defendants argue that plaintiffs cannot satisfy the first, third, and fourth elements. *See* Defs.' Mot. 23–15.

Despite defendants' assertions to the contrary, Defs.' Reply at 8–9, the first element is satisfied because Officer Ruggiero, who worked under the supervision of Sergeant Cruz, signed criminal complaints against both Mr. Figueroa and Ms. Musmacher. *See* Shapovalova Decl., Exs. P & Q (criminal complaints). "[U]nder New York law, the act of signing the criminal court complaint . . . is considered the commencement of a criminal proceeding." *Borges v. City of New York*, 621 F. Supp. 3d 362, 372 (E.D.N.Y. 2022). Plaintiffs cannot, however, satisfy the third or fourth elements.

In the context of malicious prosecution, probable cause is "measured as of the time the judicial proceeding is commenced" rather than the time of arrest. *Id.* (citations and internal quotations omitted). "If probable cause existed at the time of arrest, it continues to exist at the time of prosecution unless undermined by the discovery of some intervening fact." *Johnson v. Constantellis,* 221 Fed. App'x. 48, 50 (2d Cir. 2007) (citation and internal quotations omitted); *see also Feinberg v. Saks & Co.*, 56 N.Y.2d 206, 210 (N.Y. 1982) ("[The] existence of such probable cause [to arrest] will also serve to bar an action for malicious prosecution unless some intervening fact exonerating plaintiff has become known to defendants between the time of detention and the time of prosecution.") "In order for probable cause to dissipate, the groundless nature of the charges must be made apparent by the discovery of some intervening fact." *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 571 (2d Cir. 1996). "Police officers with probable cause to arrest are also entitled to qualified immunity as to malicious prosecution claims, because after arrest the matter is in the hands of the prosecutorial authorities making the decision to continue with the prosecution and outside of police discretion." *Gil*, 590 F. Supp. 2d at 370.

Mr. Figueroa and Ms. Musmacher were arrested in the early morning hours of April 21, 2018 and were arraigned later that same day. As I have already explained, there was probable cause for the arrest based on Mr. Sherpa's positive identification at the show up. Plaintiffs have not identified any "intervening facts" that were revealed during the brief window between the arrest and the filing of charges. As such, no reasonable juror could conclude that defendants lacked probable cause to charge plaintiffs in connection with the attempted carjacking.[6] Defendant officers are also entitled to qualified immunity on this basis. *See Gil*, 590 F. Supp. 2d at 370.

_____

[6] As to the drug charges filed against Mr. Figueroa, Shapovalova Decl., Ex. P, probable cause is separately established by the grand jury's return of the indictment. However, plaintiffs do not contest this conclusion. *See, e.g.*, Pls.' Opp'n at 18 ("The fact of the indictment does not negate

Similarly, plaintiff has not presented any evidence that defendants acted with malice in initiating the criminal proceedings. Under New York law, malice requires a showing "that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served." *Lowth*, 82 F.3d at 573. Plaintiffs argue that defendants acted with malice because they could not possibly "believe that the prosecution . . . would succeed" due to deficiencies in the complaining witness's identification. Pls.' Opp'n at 17. This amounts to a recitation of plaintiffs' argument that the officers lacked probable cause to make the arrest. As I have already explained, Officer Ruggiero did have probable cause.

## III.    Fair Trial Claim

Plaintiffs' complaint also includes several claims asserting that the procedures used by the defendant officers violated plaintiffs' right to a fair trial. [7] *See* SAC ¶ 37 (describing the show-up identification as "unduly suggestive" and therefore "unconstitutional"); *id.* ¶ 39 (asserting that the defendant officers "asked [the complaining witness] to identify the [p]laintiffs as the robbers" in violation of their constitutional rights); *id.* ¶ 41 (claiming that the defendant officers "manufactured evidence against [plaintiffs] and denied them their rights to a fair trial"). For the reasons that follow, I grant defendants' motion for summary judgment on these claims.

"Notwithstanding the nomenclature, a criminal defendant's right to a fair trial protects more than the fairness of the trial itself . . . . [A] criminal defendant can bring a fair trial claim even

---

lack of probable cause to prosecute for the [other] offenses[.]"). In any event, these issues are separable, as "probable cause must be shown as to each crime charged in the underlying criminal action." *Kee v. City of New York*, 12 F.4th 150, 166 (2d Cir. 2021).

[7] While the SAC does not clearly explain the legal basis for each of these claims, I construe all of them (plaintiffs' third, fourth, and fifth causes of action) as claims arising from plaintiffs' constitutional rights to a fair trial.

when no trial occurs at all." *Frost v. New York City Police Dep't*, 980 F.3d 231, 249 (2d Cir. 2020). The right to a fair trial "protects against deprivation of liberty that results when a police officer fabricates and forwards evidence to a prosecutor that would be likely to influence a jury's decision, *were that evidence presented to the jury.*" *Id.* at 250. "To prove a Section 1983 fair trial claim, a plaintiff must establish that (1) the officer created false information, (2) the officer forwarded the false information to prosecutors, (3) the false information was likely to influence a jury's decision, and (4) the plaintiff suffered a deprivation of life, liberty, or property as a result of the officer's actions." *Kee v. City of New York*, 12 F.4th 150, 168 (2d Cir. 2021). "Because probable cause is no defense to a denial of the right to a fair trial claim, fair trial claims cover kinds of police misconduct not addressed by false arrest or malicious prosecution claims." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 278 (2d Cir. 2016).

The essence of plaintiffs' fair trial claims is a challenge to the propriety of the "show-up" identification procedure used by the defendant officers. As I previously explained, such a claim is on shaky footing from the outset because "courts in this Circuit routinely have held" that "exigent showup identifications effected immediately following a street crime" are permissible. *Valtin v. Hollins*, 248 F. Supp. 2d 311, 318 (S.D.N.Y. 2003). Courts have also commented that show-up identifications are "consistent with good police work" because they facilitate "the immediate release of an innocent suspect" while also "enabl[ing] the police to resume the search for the fleeing culprit while the trail is fresh." *United States ex rel. Cummings v. Zelker*, 455 F.2d 714, 716 (2d Cir. 1972) (citations and internal quotation marks omitted).

Moreover, although plaintiffs' complaint contains a bare assertion that defendants "manufactured evidence," SAC ¶ 41, plaintiffs have not presented evidence that any of the defendants "created false information," *Kee*, 12 F.4th at 168. Even assuming that the complaining

witness, Mr. Sherpa, was mistaken in his identification *and* that defendants used suggestive tactics to mislead him into making the identification, there is no evidence that any officer lied when relaying Mr. Sherpa's statements to the prosecution. Without any evidence to support the bare assertion that the defendant officers manufactured evidence, plaintiffs' fair trial claims must fail.[8] *See, e.g.*, *Bennett v. Vidal*, 267 F. Supp. 3d 487, 499 (S.D.N.Y. 2017) (dismissing fair trial claim, reasoning that "this is not a case where the plaintiff has presented evidence indicating that an officer falsified information or fabricated evidence sufficient to defeat a motion for summary judgment"). I therefore grant summary judgment to defendants on these claims.

## IV.    Failure to Intervene Claim

In their ninth cause of action, plaintiffs raise a claim against each of the defendant officers for failure to intervene to stop the violations of plaintiffs' constitutional rights. *See* SAC ¶ 53.

As explained above, defendant officers are entitled to summary judgment on each of the underlying constitutional claims, which means there is no basis for a failure-to-intervene claim. *See Matthews v. City of New York*, 889 F. Supp. 2d 418, 443–44 (E.D.N.Y. 2012) ("[T]he failure to intervene claim is contingent upon the disposition of the primary claims underlying the failure to intervene claim."); *Forney v. Forney*, 96 F. Supp. 3d 7, 13 (E.D.N.Y. 2015) ("[T]here can be no failure to intervene claim without a primary constitutional violation."). Moreover, plaintiffs did not in any way address defendants' arguments regarding the failure to intervene claim in their opposition brief. *See* Defs.' Reply at 11–12. "Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment

---

[8] The Second Circuit's reasoning in *Anilao v. Spota*, 27 F.4th 855 (2d Cir. 2022), serves to reinforce my conclusion. There, the Court drew a distinction between an officer's mere decision "not to present evidence" to prosecutors with the type of "egregious conduct" that can rise to the level of a "constitutional violation," such as the creation of "false or fraudulently altered documents." *Id.* at 871 n.12.

fails to address the argument in any way." *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003).

I therefore grant defendants' motion for summary judgment on the failure-to-intervene claim.

## V.    *Monell* Claim

Plaintiffs' tenth and final cause of action is brought pursuant to *Monell v. Dep't of Social Servs. of City of N.Y.*, 436 U.S. 658 (1978), and alleges that the violations of plaintiffs' constitutional rights "were all committed as a result of the City of New York's failure to properly train, supervise, [and] discipline its [o]fficers," SAC ¶ 55. For the reasons set forth below, I grant defendants' motion for summary judgment on this claim.

To raise a *Monell* claim against a municipality, a plaintiff is required to prove three elements: "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Lucente v. Cnty. of Suffok*, 980 F.3d 284, 297 (2d Cir. 2020) (citing *Monell*, 436 U.S. at 690–91). A plaintiff may plead the existence of an official policy or custom by alleging the existence of a "formal policy which is officially endorsed by the municipality." *Calicchio v. Sachem Cent. Sch. Dist.*, 185 F. Supp. 3d 303, 311 (E.D.N.Y. 2016). Even if there is not an explicitly adopted official policy, a plaintiff may establish that such a policy or custom exists by alleging "practices so persistent and widespread [that they] practically have the force of law." *Lucente*, 980 F.3d at 297 (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)). A plaintiff whose complaint articulates "only isolated instances of unconstitutional behavior," however, has not plausibly alleged municipal liability. *Douglas v. City of Peekskill*, No. 21-CV-10644, 2023 WL 2632217, at *9 (S.D.N.Y. March 24, 2023) (internal quotation marks omitted). "[A] single incident alleged in a complaint, especially if it involved only actors below the policy-making level,

does not suffice to show a municipal policy." *Josie v. City of New York*, No. 21-CV-2486, 2023 WL 3765063, at *12 (E.D.N.Y. June 1, 2023) (quoting *Decarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998)).

There is no evidence of an official NYPD policy that caused, directly or indirectly, any constitutional violation. Rather, the brunt of plaintiffs' argument appears to be that the NYPD's practices—namely, its failure to "train long term police officers, detectives, and sergeants on what amounts to suggestive identification and what to do to cure it," Pls.' Opp'n at 23—amount to "deliberate indifference" to the rights of individuals who encounter the police, *id.* at 22–23. The Supreme Court has indeed recognized that, "[i]n limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick*, 562 U.S. at 61. But the Court has also held that "deliberate indifference is a stringent standard of fault" and that "[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Id.* at 61–62 (internal quotation marks omitted).

Here, plaintiffs have presented no evidence of a pattern of constitutional violations, instead relying only on the facts of the specific incident in question. *See* Pls.' Opp'n at 23–24. While the Supreme Court left open the possibility that, in certain "patently obvious" cases, "a city could be liable under § 1983 without proof of a pre-existing pattern of violations," *Connick*, 562 U.S. at 64, this is not such a case. Plaintiffs have failed to present evidence of any kind regarding how the NYPD trains its officers, let alone evidence showing that the NYPD's training causes a "patently obvious" violation of the public's constitutional rights. I therefore grant summary judgment to defendants on plaintiffs' *Monell* claim.

## VI.    State Law Claims

With the exception of their *Monell* claim, each of plaintiffs' causes of action asserts a claim for damages under both 42 U.S.C. § 1983 and New York constitutional law. *See* SAC ¶¶ 33, 35, 37, 39, 41, 46, 48, 51, 53 (invoking N.Y. Const. art. 1 § 12). For several of the claims, including the false arrest and malicious prosecution claims, there is likely no separate cause of action under state constitutional law since an adequate alternative remedy is available under state tort law or § 1983. *See Alwan v. City of New York*, 311 F. Supp. 3d 570, 586 (E.D.N.Y. 2018) (explaining that "New York courts have held that a private right of action for violations of the state constitution is unavailable if an alternative remedy is available elsewhere, such as under state tort law" and "[f]ederal courts in this circuit have apparently uniformly held that no private right of action exists for violations of the New York State Constitution where the plaintiff has an alternative remedy under § 1983 for violations of parallel provisions of the U.S. Constitution").

To extent that plaintiffs raise state constitutional claims for which remedies are not "otherwise [] available at common law or under § 1983," *Allen v. Antal*, 665 Fed. App'x 9, 13 (2d Cir. 2016), defendants are entitled to summary judgment for the additional reason that they are time-barred under state law.  *See Jones v. City of New York*, No. 13-CV-929, 2016 WL 1322443 (S.D.N.Y. Mar. 31, 2016) ("[T]he filing of state law claims alongside federal claims in a federal forum does not affect, let alone lengthen, the statute of limitations applicable to the state law claims.").

New York law requires plaintiffs bringing tort suits against municipal officers to commence the action "within one year and ninety days after the happening of the event upon which the claim is based," N.Y. Gen. Mun. Law § 50-i(1). Here, plaintiffs were arrested on April 21, 2018. They were detained for periods of twelve days and three months, respectively, which means

20

plaintiffs were released, at the latest, in late July 2018. Pls.' Opp'n 10. The charges were dismissed on December 5, 2018. *Id*; SAC ¶ 21. That is the latest date of an event on which plaintiffs' claims could conceivably be based. *See Bailey v. City of New York*, 79 F. Supp. 3d 424, 451 (E.D.N.Y. 2015) ("A state law claim for malicious prosecution, like a federal claim, accrues on the date the criminal proceeding in question terminated in plaintiff's favor."); *Jones v. City of New York*, No. 13-CV-929, 2016 WL 1322443 (S.D.N.Y. Mar. 31, 2016) ("Claims for false arrest . . . accrue upon the plaintiff's physical release from custody."). Plaintiffs did not file the case until April 19, 2021, more than twenty-eight months after December 5, 2018. Accordingly, none of plaintiffs' state law claims survive.

## VII.    Claims against Defendant McIlmurray

Finally, defendants argue that plaintiffs' claims against defendant Patrick McIlmurray fail for the additional reason that there is no evidence of Detective McIlmurray's personal involvement in the alleged constitutional deprivations. Defs.' Mot. at 25–26. I agree with defendants.

In their response to defendants' Rule 56.1 statement, plaintiffs dispute the assertion that Detective McIlmurray was not working on April 21, 2018—the date of plaintiffs' arrest and arraignments. *See* Pls. Resp. Defs. 56.1 Statement ¶ 15. However, plaintiffs have not produced any evidence to counter Defendant McIllmurray's deposition testimony that he was off duty that day, as he always was on Saturdays. Shapovalova Decl., Ex. L, 37–38. Absent any evidence to the contrary, I conclude that there is no genuine dispute as to whether Defendant McIllmurray participated in the initial stop, arrest, or post-arrest processing on April 21st.

As for the alleged deficiencies in the subsequent investigation, plaintiffs have not proffered evidence that Detective McIlmurray did any work on their cases, let alone that his conduct could be construed as malice or fabrication for the purpose of a malicious prosecution or fair trial claim.

*See Manganiello*, 612 F.3d at 161 (elements of malicious prosecution); *Kee*, 12 F.4th at 168 (elements of fair trial claim). Viewing the evidence in the light most favorable to plaintiffs, I find it that a reasonable jury could conclude that Detective McIlmurray was assigned to plaintiffs' cases in some capacity for some period of time after April 21, 2018. *See* Ofodile Decl., Ex. 2 at 27–28 (McIlmurray's deposition testimony someone from the 108th Precinct told him in 2021 that he had been previously assigned to the case in 2018). However, there is no evidence in the parties' exhibits regarding Detective McIlmurray's actual conduct in either case. In his deposition testimony, Detective McIlmurray indicated that he had no memory of speaking to the plaintiffs, or of doing any other work on their cases. *Id*. at 26–27. Nor is there documentary evidence, such as copies of the DD5s referenced in the parties' papers, characterizing Detective McIlmurray's investigative efforts (or lack thereof). Without additional evidence, no reasonable jury could infer that Detective McIlmurray's conduct amounted to a violation of plaintiffs' constitutional rights.

## CONCLUSION

For the foregoing reasons, I grant defendants' motion for summary judgment in its entirety.

SO ORDERED.

/s/_____
Allyne R. Ross
United States District Judge

Dated:        February 24, 2025
              Brooklyn, New York